UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMMERCIAL LOAN CORPORATION, | ) | No.  04 B 18946 |
| | ) | |
| Debtor. | ) | |
| ―――――――――――――― | ) | |
| | ) | |
| CLC CREDITORS' GRANTOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 A 2538 |
| | ) | |
| HOWARD SAVINGS BANK; LINCOLN | ) | |
| STATE BANK; HSB DEVELOPMENT | ) | |
| CORPORATION; HOWARD | ) | |
| LIQUIDATION CORPORATION ;and | ) | |
| LSB FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

Before the court for ruling in this adversary proceeding is the amended

motion of defendants Howard Savings Bank ("Howard"), Lincoln State Bank

("Lincoln"), HSB Development Corp. ("HSB"), and LSB Financial Services, Inc.

("LSB") (collectively "the banks") for partial summary judgment on seven counts of

the amended adversary complaint of plaintiff CLC Creditors' Grantor Trust (the

"Trust").[1/]  The amended complaint seeks to recover as fraudulent certain transfers

---

[1/]      Defendant Howard Liquidation Corporation ("HLC") was added as a
defendant after Howard ceased doing business.  (Adv. Docket No. 75).  The order
adding HLC provided that it would be bound by any judgment against Howard or
HSB (id.), and the banks amended their summary judgment motion to add HLC as
a movant (id., No. 79).  The rulings in this opinion on the claims against Howard

that debtor Commercial Loan Corporation ("CLC") made to the banks. On six of the counts, the banks assume the voidability of the transfers but contend that the transfers cannot be recovered from them under either section 550(a)(1) or (2) of the Bankruptcy Code. On the remaining count, the banks challenge the merits of the fraudulent transfer claim itself.

During briefing on the summary judgment motion, the banks filed motions *in limine* with respect to two affidavits the Trust had submitted in opposition, the affidavits of Richard Fogel ("Fogel") and Patrick O'Malley ("O'Malley"). The motions *in limine* (which have been separately briefed) will be treated as motions to strike the affidavits. *See Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1986) (noting that the correct tool for challenging an affidavit that violates Rule 56(e) is a motion to strike).

For the reasons that follow, the banks' motion to strike the Fogel affidavit will be granted, the banks' motion to strike the O'Malley affidavit will be denied, and the banks' motion for partial summary judgment will be granted in part and denied in part.

## I. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (H).

and HSB therefore apply equally to HLC.

## II. Facts

The Trust and the banks have filed statements of facts and responses pursuant to Local Rules 7056-1 and 7056-2. (*See* Adv. Docket Nos. 80, 93, 94, 110). The following material facts are not in dispute.

CLC was incorporated in Illinois in November 1999. (P. 7056-2 Resp. ¶ 12). Its principal business was to originate and service commercial loans secured by real and personal property. (D. 7056-2 Resp. ¶ 23). Peter M. Hueser ("Hueser") was one of CLC's original shareholders and also served as its president and chairman. (P. 7056-2 Resp. ¶¶ 13-14).

CLC funded some of the loans it made in its own right but funded the vast majority by selling participation interests to various banks. (D. 7056-2 Resp. ¶ 24). Howard and Lincoln purchased participation interests in some of these CLC loans. Howard and Lincoln were also among CLC's original shareholders, along with two other banks. (*Id.* at ¶ 25; P. 7056-2 Resp. ¶ 13). Each of the shareholder banks had a representative on CLC's board of directors.[2] (P. 7056-2 Resp. ¶ 13).

Around August 2000, Howard transferred all of its CLC stock to HSB, a subsidiary of Howard.[3] (*Id.* at ¶ 15). At nearly the same time, Lincoln transferred

_____

[2]     "Representative" is the parties' term. Since a member of a corporate board of directors is a "director," Howard's representative on the board was a director of CLC, and it is reasonable to infer that Howard was effectively a director.

[3]     The name and nature of HSB are unclear. Apparently, there was never an entity called "HSB Development Corp." (*See* Answer of Howard & HSB to Am. Compl. ¶ 8). At some point, there was an "HSB Construction Lending Corp." (*id.*), but the parties fail to say whether defendant HSB is that HSB or some other

all of its CLC stock to LSB, a corporation wholly-owned by Lincoln. (*Id.* at ¶ 16).

At some point, Hueser caused CLC to extend an $850,000 unsecured line of credit to MFC, LLC ("MFC"), a non-existent entity that Hueser fabricated. (*Id.* at ¶¶ 27-28). CLC made advances on this line of credit of $225,000 on or about December 27, 2001, and $250,000 on or about November 6, 2002. (D. 7056-2 Resp. ¶¶ 33, 39). The funds were not directed to MFC – not surprisingly, since there was no such company – but were instead deposited in the account of WK Financial ("WK") at Hinsdale Bank & Trust. (P. 7056-2 Resp. ¶ 30).

WK was a corporation Hueser created in the late 1990s to fund a bank acquisition. (P. 7056-2 Resp. ¶ 31; D. 7056-2 Resp. ¶ 43). Hueser served as both an officer and a shareholder of WK. (P. 7056-2 Resp. ¶ 31). The advances on the MFC loan were commingled with WK's other funds in its account at Hinsdale Bank & Trust. (*Id.* at ¶ 32). Neither Howard nor Lincoln was a signatory on the WK account. (*Id.* at ¶ 33).

On November 29, 2001, LSB and Hueser entered into a stock purchase agreement under which LSB sold its 2,000 shares of CLC stock to Hueser for $225,000. (*Id.* at ¶ 34). On December 28, 2001, Lincoln (not LSB) received payment for the stock in the form of a wire transfer from Hinsdale Bank & Trust, with WK listed as the originator and Hueser listed as the beneficiary. (*Id.* at ¶ 36; D. 7056-2 Resp. ¶ 34). Nothing in the confirmation indicated that the wired funds

---

HSB. The parties do agree that defendant HSB was a Howard subsidiary. (*Id.*).

originated from CLC. (P. 7056-2 Resp. ¶ 37). Lincoln's internal records of the wire transfer, however, reflected receipt of $225,000 "[f]rom Commercial Loan Corporation." (D. 7056-2 Resp. ¶ 36). Lincoln then transferred the funds to LSB's money market account at Lincoln. (D. 7056-2 Resp. ¶ 37). The deposit ticket read: "Wire Transfer From Commercial Loan Corporation."[4] (Id.).

A few months later, on February 12, 2002, CLC held a board meeting where Hueser presented an independent auditors' report on CLC's financial affairs as of December 31, 2001. (P. 7056-2 Resp. at ¶¶ 20-21). According to the financial statements, CLC had net income for 2001 of $260,593. (Id. at ¶ 22). The board members discussed the payment of a dividend and eventually voted to have CLC pay a dividend of $0.06 per share, or a total of $130,000. (Id. at ¶¶ 23-24; D. 7056-2 Resp. ¶ 53). HSB received a dividend of $30,748. (P. 7056-2 Resp. ¶ 25).

On November 8, 2002, HSB and Hueser entered into a stock purchase agreement under which HSB sold its 500,000 shares of CLC stock to Hueser for

---

[4]     The Trust states as facts the contents of the wire transfer records and the deposit ticket. (P. 7056-1 Stmt. ¶¶ 36-37). The Trust also asserts as a fact that the wire transfer records "establish" that CLC was the source of the funds (id. at ¶ 36) – meaning, presumably, that the records establish Lincoln's and LSB's knowledge of the source. In response, the banks purport to deny the Trust's statements in their entirety on the ground that "[t]he notation appearing in the wire transfer records does not establish the source of funds." (D. 7056-2 Resp. ¶¶ 36-37). That denial, however, is not a denial that the notations exist; it is a denial of the inference the Trust would have drawn from them. Because the banks have not denied the facts of the notations, those facts are deemed admitted. See L.R. 7056-1(C). As for the desired inference, it is not something that can be admitted or denied. The inference must be drawn if it is reasonable because on summary judgment all reasonable inferences are drawn in favor of the non-movant. See Miles Distribs., Inc. v. Specialty Constr. Brands, Inc., 476 F.3d 442, 448 (7th Cir. 2007).

$250,000. (*Id.* at ¶ 38). Hueser had WK pay HSB the $250,000 in the form of a

cashier's check drawn on Hinsdale Bank & Trust. (*Id.* at ¶ 39). The check listed

"CLC Stock Purchase" as the remitter rather than Hueser. (*Id.*). By early 2003,

Hueser had purchased all the outstanding shares of CLC stock from the original

shareholders. (D. 7056-2 Resp. ¶ 4).

On May 13, 2004, CLC filed this chapter 11 bankruptcy case. (Bankr. Docket

No. 1).[5] Within two weeks, Fogel was appointed chapter 11 trustee. (*Id.* at No. 63).

Fogel hired O'Malley as his financial advisor for the purpose of analyzing CLC's

assets, liabilities, financial affairs, and business operations. (*Id.* at Nos. 100, 110,

123). On December 15, 2004, the court confirmed the Creditors' Second Amended

Plan of Liquidation, which provided for the creation of the Trust. (*Id.* at No. 396).

Under the Plan, Fogel assigned all of CLC's assets to the Trust, including the

claims asserted here. (P. 7056-2 Resp. at ¶ 5).

The following year, the Trust commenced this adversary proceeding to avoid

certain allegedly fraudulent transfers from CLC to the banks (Adv. Docket No. 1),

filing what became a fifteen-count amended complaint (*id.* at No. 20). Six counts of

the amended complaint (Counts I, II, III, X, XI, and XII) were later voluntarily

dismissed. (*Id.* at Nos. 73, 74). Howard, HSB, Lincoln, and LSB have now moved

for summary judgment on Counts VII, VIII, IX, XIII, XIV, and XV, the counts

alleging that the payments to HSB and LSB for the CLC stock were fraudulent.

---

[5]    The court can take judicial notice of its own docket entries. *See Griffin
v. United States*, 109 F.3d 1217, 1218 n.1 (7th Cir. 1997).

-6-

Howard and HSB have also moved for summary judgment on Count IV, one of the counts alleging that CLC's payment of the February 2002 dividend was fraudulent.

## III.  Discussion

The banks' motion for partial summary judgment will be granted on the claims in Counts VII, VIII, and IX against Howard and HSB concerning the stock purchase payments, but the motion will be denied on the stock purchase claims against Lincoln and LSB in Counts XIII, XIV, and XV.  The banks' motion will also be granted on the claim in Count IV against Howard and HSB concerning the 2002 dividend payment.

### A.  Motions to Strike

Before considering the claims on the merits, it is necessary to address the banks' motions to strike the Fogel and O'Malley affidavits.  The banks object to the Fogel affidavit on the grounds (1) that the affidavit is offered as expert testimony (a point the Trust disputes), and Fogel lacks the qualifications to provide the testimony in his affidavit; and (2) that even if Fogel is qualified to serve as an expert, he was not timely disclosed as one.  The banks object to the O'Malley affidavit (which the Trust acknowledges is offered as expert testimony) on the ground that it contains inadmissible legal conclusions.

#### 1.  Fogel Affidavit

The motion to strike Fogel's affidavit will be granted because Fogel was not

disclosed as an expert witness.[6]

Although the Trust contends otherwise, Fogel's affidavit contains expert testimony. The Federal Rules of Evidence divide opinion testimony into lay and expert testimony. Expert testimony is founded on "scientific, technical, or other specialized knowledge," Fed. R. Evid. 702; lay testimony consists of opinions or inferences "rationally based on the perception of the witness," Fed. R. Evid. 701. Put more concretely, lay opinions are based on "a process of reasoning familiar in everyday life," whereas expert opinions result from "the process of reasoning which can be mastered only be specialists in the field." Fed. R. Evid. 701 advisory committee note (2000) (internal quotations omitted).

Fogel's affidavit fits the definition of expert testimony under Rule 702. In his affidavit, Fogel offers opinions about the status of CLC's participation loans and CLC's ability to pay amounts in connection with the loans. To reach these opinions, he reviewed several years of CLC financial statements in his capacity as chapter 11 trustee. These are not the kinds of opinions a lay person can offer employing the reasoning of "everyday life." *Cf. Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 38 (2d Cir. 1996) (stating that a finding of insolvency usually requires expert testimony); *United States v. Sobin*, 56 F.3d 1423, 1427-28 (D.C. Cir. 1995) (finding a trustee's testimony about bankruptcy matters to be expert testimony). The process by which Fogel reached his opinions required his

_____

[6]     Because the affidavit will be stricken on this ground, the contention that Fogel is unqualified to serve as an expert need not be addressed.

-8-

experience and skill as a trustee.[1/] His opinions are expert opinions.

The Rules prevent one party from springing expert testimony on another. If a party intends to introduce expert testimony, the party must disclose that intention, identifying the expert and providing a copy of the expert's written report. Fed. R. Civ. P. 26(a)(2)(A), (B); *Mannoia v. Farrow*, 476 F.3d 453, 456 (7th Cir. 2007). These disclosures must be made either by the date the court sets or at least 90 days before trial. Fed. R. Civ. P. 26(a)(2)(C). Failure to comply with these requirements will bar the party from introducing the expert's testimony, unless the non-disclosure "was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008); *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 869 (7th Cir. 2005).

The Trust never disclosed Fogel as an expert. After many extensions, an order was entered on August 8, 2007, setting November 30, 2007, as the deadline for all discovery. (Adv. Docket No. 71). The order set specific expert discovery deadlines only for the banks, not for the Trust, but a deadline for all discovery is a deadline for expert discovery under Rule 26(a)(2)(C). *See Sherrod v. Lingle*, 223 F.3d 605, 612-13 (7th Cir. 2000). The Trust's experts therefore had to be disclosed no later than November 30, 2007. Fogel was not disclosed by that date. Indeed, the banks assert without contradiction that they first learned of Fogel on March 4,

---

[1/]      The court has previously noted that Fogel "is a capable and experienced bankruptcy lawyer and trustee who has been evaluating and litigating the claims of bankruptcy estates for almost a quarter of a century." *In re Commercial Loan Corp.*, 316 B.R. 690, 703 (Bankr. N.D. Ill. 2004).

2008, when the Trust filed his affidavit in opposition to summary judgment. The Trust offers no justification for the non-disclosure (apart from the erroneous contention that Fogel is not an expert), nor does the Trust claim the non-disclosure was harmless.

Because Fogel's affidavit consists of expert opinions and Fogel was not timely disclosed as an expert, the motion to strike his affidavit will be granted.

### 2. O'Malley Affidavit

The banks' motion to strike the O'Malley affidavit because it contains legal conclusions, on the other hand, will be denied.

Experts cannot offer legal opinions. *United States v. Diekhoff*, 535 F.3d 611, 619 (7th Cir. 2008); *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997); *United States v. Sinclair,* 74 F.3d 753, 758 n.1 (7th Cir. 1996) (noting that Rules 702 and 704 "prohibit experts from offering opinions about legal issues that will determine the outcome of the case"). Legal opinions are impermissible, not because they are legal, but because they do not "assist the trier of fact" as Rule 702 requires. Fed. R. Evid. 702; *see United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002); *Richman v. Sheahan*, 415 F. Supp. 2d 929, 945 n.15 (N.D. Ill. 2006).

The best way to determine whether an expert is opining on a legal issue is to examine his terminology. *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006); *Barile*, 286 F.3d at 760. If the terms he uses have a "'separate, distinct and specialized meaning in the law different from that present in the vernacular,'" the

opinion is a legal one and likely impermissible. *McIver*, 470 F.3d at 562 (quoting

*Barile*, 286 F.3d at 760); *Richman*, 415 F. Supp. 2d at 947. If the terms have an

ordinary meaning, by contrast, the opinion should be allowed. *Richman*, 415 F.

Supp. 2d at 947. This is true even when the legal and ordinary meanings are

congruent, as long as the opinion is not a bald legal conclusion. *Id.* An expert may

also opine on facts that support a particular legal conclusion, provided he does not

testify that the facts actually warrant the conclusion. *Burkhart v. Washington*

*Metro. Area Transit Auth.*, 112 F.3d 1207, 1212-13 (D.C. Cir. 1997).

In his affidavit, O'Malley offers opinions about the origin and movement of

funds among entities involved in this case. He concludes that MFC and WK were

"conduits," a term he acknowledges finding in a judicial decision that was shown to

him. The "conduit" opinion is what has the banks so exercised.

The term "conduit" does have a legal connotation in a case of this kind.

Although the term appears nowhere in the Code, courts have used it to mean

someone who received and then transferred property but lacked sufficient control

over the property to be liable under section 550(a) as either an initial or a

subsequent transferee. *See, e.g., Walsh v. Townsquare Assocs. (In re Montross)*, 209

B.R. 943, 948 (B.A.P. 9th Cir. 1997); *see also Bonded Fin. Servs., Inc. v. European*

*Am. Bank*, 838 F.2d 890, 891 (7th Cir. 1988) (noting that bankruptcy court had held

bank was "mere conduit" and so was not liable as "initial transferee"); *see generally*

5 *Collier on Bankruptcy* ¶ 550.02[4][a] (Alan N. Resnick & Henry J. Sommer eds.,

15th ed. rev. 2008) (distinguishing between "transferee" and "conduit").

But "conduit" also has a more mundane definition: "a natural or artificial channel through which water or other fluid passes or is conveyed." *Webster's Third New International Dictionary* 474 (1981); *see also The American Heritage Dictionary* 394 (3d ed. 1996) (defining "conduit" as "[a] pipe or channel for conveying fluids, such as water"). Since the term has a technical legal meaning in a fraudulent transfer case but also has a more common, non-legal meaning, O'Malley's affidavit is only problematic if it offers a bald legal conclusion. *Richman*, 415 F. Supp. 2d at 947. It does not. The affidavit purports to connect the dots about the origins and movement of the funds to support a "mere conduit" argument. That is permissible. *Burkhart*, 112 F.3d at 1212-13. That O'Malley happens to use the word "conduit" in the process, a word that appears in some judicial decisions, does not turn his opinion into a legal one. Any legal connotation the word has can be disregarded. *See, e.g., Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 68 (Bankr. N.D. Ill. 2002) (allowing expert testimony using terms "lifted from the statute" because the court could treat those terms as "mere surplusage").

The motion of the banks to strike the O'Malley affidavit on the ground that it contains an impermissible legal opinion will be denied.

## B. Summary Judgment

On the merits, the motion for partial summary judgment will be granted on some counts and denied on others. As to the counts concerning the payments for

CLC stock, summary judgment will be granted to Howard and HSB but denied to

Lincoln and LSB. None of the banks was an initial transferee under section

550(a)(1), leaving section 550(a)(2) as the only source of potential liability. Howard

and HSB have established a valid affirmative defense to liability under section

550(a)(2); Lincoln and LSB have not. As to the count concerning the dividend

payment, summary judgment will granted to Howard and HSB. The claim is based

on actual fraud, and the Trust has not adduced sufficient evidence that CLC had

the requisite fraudulent intent when it paid the dividend.

### 1. Rule 56 Standard

The summary judgment standard under Rule 56 is familiar: summary

judgment is appropriate when there is no genuine issue of material fact, and the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c) (made

applicable by Fed. R. Bankr. P. 7056). On a motion for summary judgment, then,

"[t]he court has one task and one task only: to decide, based on the evidence of

record, whether there is any material dispute of fact that requires a trial." *Payne v.*

*Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (internal quotation omitted). A genuine

issue of material fact exists if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986).

Summary judgment is the "put up or shut up moment in a lawsuit, when a

party must show what evidence it has that would convince a trier of fact to accept

-13-

its version of the events." *Hammel*, 407 F.3d at 859 (internal quotation omitted).

When a defendant moves for summary judgment, the plaintiff must adduce evidence to support each element of his claim on which he has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Failing that, the motion will be granted. *See Brummett v. Sinclair Broad. Group, Inc.*, 414 F.3d 686, 692-94 (7th Cir. 2005). When a defendant moves for summary judgment on an affirmative defense, however, he has the burden of proof and so must submit evidence establishing each element of the defense. *See Zenith Elec. Corp. v. Panalpina, Inc.*, 68 F.3d 197, 201 (7th Cir. 1995). Otherwise, the motion will be denied.

### 2. Stock Sales

### a. Liability as Initial Transferee

The undisputed facts show as a matter of law that none of the banks was an initial transferee potentially liable to the Trust under section 550(a)(1) in connection with the stock sales.

Section 544 of the Code enables a trustee to avoid certain pre-petition transfers of property fraudulent under federal or state law. *See* 11 U.S.C. § 544; *see also Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 586-87 (Bankr. N. D. Ill. 2005). Section 550(a)(1), in turn, allows the trustee to recover a transfer avoided under section 544 from the "initial transferee." *See* 11 U.S.C. § 550(a)(1). Although the Code does not define "transferee," *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988), explains that a "transferee" has

-14-

"dominion over the money or other asset, the right to put the money to use for its

own purposes." *Id.* at 893. The "initial" transferee is the first entity to have such a

dominion or right. *Kepler v. Aetna Fin. Co. (In re Ausman Jewelers, Inc.)*, 177 B.R.

282, 286 (Bankr. W.D. Wis. 1995).

A person or entity is not the initial transferee under *Bonded* if it received no

benefit from the transferred funds, had to follow instructions on how to use the

funds, and would have been liable to the transferor if it had used the funds for its

own purposes. *Bonded*, 838 F.2d at 893-94; *see also IBT Int'l Inc. v. Northern (In re*

*Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 705 (11th Cir. 2005). On the other hand,

when an entity has an unfettered legal right to use or redirect transferred funds for

any purpose it chooses, it likely has sufficient dominion and control to be considered

the initial transferee under section 550(a)(1). *See Leonard v. First Commercial*

*Mortgage Co. (In re Circuit Alliance, Inc.)*, 228 B.R. 225, 232 (D. Minn. 1998);

*Peterson v. Hofmann (In re Delta Phones, Inc.)*, No. 05 A 1205, 2005 WL 3542667, at

*4 (Bankr. N.D. Ill. Dec. 23, 2005).

The record on summary judgment establishes that WK was the "initial

transferee" of the funds CLC transferred in December 2001 and November 2002 to

WK's account at Hinsdale Bank & Trust. (D. 7056-2 Resp. ¶¶ 33, 38; P. 7056-2

Resp. ¶ 30). It is undisputed that CLC did in fact transfer the funds to WK's

account, not to any of the banks. Moreover, no evidence suggests that any

instructions were given to WK on how to use the funds or any limitations placed on

-15-

how WK could use them. As far as the record shows, WK could have done whatever it wanted with the funds and not given anyone a basis for legal recourse. Because WK was the first to receive the transferred funds and had dominion over them, WK was the initial transferee, not the banks. *See Hansen v. 5841 Bldg. Corp. (In re Hansen)*, 341 B.R. 638, 643 (Bankr. N.D. Ill. 2006).

Armed with the O'Malley affidavit, the Trust contends that WK was not the initial transferee. WK was not the initial transferee, the Trust insists, because it was merely a shell corporation doing the bidding of Hueser, its shareholder, director, and president, and so was a mere conduit for the payments.

There are two problems with this argument. First, the Trust has produced no evidence that WK was in fact a shell. A shell corporation is "a company that is incorporated, but has no significant assets or operations." *Nautilus Ins. Co. v. Reuter*, 537 F.3d 733, 737 (7th Cir. 2008) (internal quotation omitted). The Trust has not shown that WK lacked significant assets or operations at the time of the transfer or for that matter at any other time. The Trust asserts that WK was created for the sole purpose of a bank acquisition many years earlier, but that hardly demonstrates that WK was a shell. The Trust also cites the conclusion in O'Malley's report that WK was "controlled by" Hueser, WK's president, but the conclusion has no support, and the president's "control" of a corporation (a broad term O'Malley never defines) would not demonstrate that the corporation is a shell in any case.

Second, it would make no difference if WK had been a shell corporation. A

shell corporation is still a legal entity, even if it has no real assets or operations, and can still be an "initial transferee" for purposes of section 550(a)(1). *See, e.g., Lippi v. City Bank*, 955 F.2d 599, 611 (9th Cir. 1992) (finding shell corporation an "initial transferee"); *Contemporary Indus. Corp. v. Frost (In re Contemp. Indus. Corp.)*, Nos. BR 98-80382, ADV. 99-8135, 2001 WL 34630639, at *7 (Bankr. D. Neb. 2001) (same). It all depends on whether the shell corporation had "dominion over the money or other assets, the right to put the money to use for its own purposes." *Bonded*, 838 F.2d at 893. If it did, it was the initial transferee; if not, then not. And as discussed above, the Trust has supplied no evidence that WK lacked the right to use the transferred funds as it saw fit.[8]

Because WK was the "initial transferee" of the CLC funds, the Trust cannot recover those funds from the banks under section 550(a)(1).[9]

### b. Liability as Subsequent Transferee

Although WK was the initial transferee of the CLC funds, there is no

---

[8]    The Trust may be taking the position that WK was not the initial transferee but was a "mere conduit" because WK simply received the money, paid it out again, and did nothing with it in the interim. Under *Bonded*, however, the relevant question is whether the recipient had "the *right* to put the money to use for its own purposes," *Bonded*, 838 F.2d 893; *see also Universal Serv. Admin. Co. v. Post-Confirmation Comm. of Unsecured Creditors (In re Incomnet, Inc.)*, 463 F.3d 1064, 1070 (9th Cir. 2006) (noting that the *Bonded* test stresses "the *ability* of the recipient to use the money") (emphasis added), not whether the recipient actually exercised that right.

[9]    The Trust has not sought to recover the funds from the banks on the alternative ground available under section 550(a)(1), that the banks were the entities "for whose benefit such [initial] transfer was made." 11 U.S.C. § 550(a)(1).

question that WK transferred those funds to the banks. Section 550(a)(2) permits

recovery of a fraudulent transfer from any subsequent transferee, mediate or

immediate, of the initial transferee. 11 U.S.C. § 550(a)(2). The Trust can therefore

recover the transfers from the banks as subsequent transferees – unless section

550(b)(1) applies. That section shields from liability a subsequent transferee who

received a transfer in good faith, for value, and without knowledge of its voidability.

11 U.S.C. § 550(b)(1); *see Bonded,* 838 F.2d at 896.

The banks concede (as they must) that they were subsequent transferees, but

they claim to fall under section 550(b)(1). Section 550(b)(1) is an affirmative

defense. *Model Imperial Liquidating Trust v. Hamilton Bank, N.A. (In re Model

Imperial, Inc.),* 250 B.R. 776, 797 (Bankr. S.D. Fla. 2000). The banks therefore

have the burden of making out a prima facie case on each element of their defense.

*Id.; Groupe v. Hill (In re Hill),* 156 B.R. 998, 1008 (Bankr. N.D. Ill. 1993).

The undisputed facts establish the first element: the banks received the CLC

funds "for value." Courts have adopted different standards of "value." Some hold

that value is subject to a substantive measure of equivalence, such as "reasonably

equivalent value" or "fair market value." *See Rodgers v. Monaghan Co. (In re

Laguna Beach Motors, Inc.),* 159 B.R. 562, 568 (Bankr. C.D. Cal. 1993) (reasonably

equivalent value); *Brown v. Harris (In re Auxano),* 96 B.R. 957, 964 (Bankr. W.D.

Mo. 1989) (fair market value). Others take the position that the value subsequent

transferees give "need not be equivalent to the value of the property that they

-18-

receive from an earlier transferee." *McCook Metals*, 319 B.R. at 590 n.15; *see also*

*Enron Corp. v. Avenue Special Situations Fund II (In re Enron Corp.)*, 333 B.R. 205,

236 (Bankr. S.D.N.Y. 2005).[10]

   *McCook Metals* represents the better view, in part because it is consistent

with the language of the Code. Section 550(b)(1) requires only "value"; it contains

no equivalence standard. That omission is significant because Congress knows how

to impose an equivalence standard when it wants to. Section 549(c) of the Code, for

example, requires a transferee to have paid "present fair equivalent value" to

sustain a defense to an action to recover a post-petition transfer. 11 U.S.C. § 549(c).

Similarly, section 548(a)(1)(B) renders fraudulent certain transfers received for "less

than a reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B). When Congress uses

language in one part of a statute and omits it in another, the omission is presumed

to be intentional. *Bates v. United States*, 522 U.S. 23, 29 (1997).

   *McCook Metals* also is the better view because, as the *McCook Metals* court

noted, *see McCook*, 319 B.R. at 590 n.15, a concept of value free from any measure of

equivalence best comports with *Bonded*'s explanation of the section 550 scheme.

That scheme, the Seventh Circuit said, imposes strict liability on an initial

---

   [10]   The Trust suggests that another decision in this district, *Grochocinski
v. Knippen (In re Knippen)*, 355 B.R. 710 (Bankr. N.D. Ill. 2006), supports a "fair
market value" standard. Not so. In *Knippen*, the court concluded that the
subsequent transferees had in fact given value "within the fair market value
range." *Id.* at 729. The court did not address the meaning of "value" for purposes of
section 550(b)(1), perhaps because the evidence suggested that value had been given
under any definition.

transferee but gives subsequent transferees something like a holder-in-due-course

defense because some monitoring of the debtor's transfers is "both inevitable and

desirable," and the initial transferee, the party that dealt directly with the debtor,

is in the best position to perform that function. *See Bonded*, 838 F.2d at 892.

"[S]ubsequent transferees usually do not know where the assets came from and

would be ineffectual monitors if they did." *Id.* at 892-93.

Under the *McCook Metals* standard, the banks gave "value" for the CLC

funds. In exchange for those funds, the banks sold their CLC stock to Hueser. The

stock was "value" because it constituted consideration sufficient to support a simple

contract. The Trust argues that the stock had no value because CLC was insolvent

at the time of the sales,[11] but stock in a corporation may have value even though

the corporation is insolvent (in the "balance sheet" sense that its liabilities exceed

its assets). *See In re Wabash Valley Power Assoc., Inc.*, 72 F.3d 1305, 1318 (7th Cir.

1995). The banks established a prima facie case on the "value" element by showing

---

[11]     CLC's insolvency is not disputed. The Trust supports its factual
statements about insolvency with the O'Malley affidavit. In response, the banks
purport to deny the statements "as legal conclusions or opinions, not properly the
subject of a Statement of Facts." (D. 7056-2 Resp. ¶ 48). But insolvency is a
question of fact, not of law, *see Roblin*, 78 F.3d at 35; *Gilman v. Scientific Research
Prods., Inc. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir. 1995); *Baldi v.
Samuel Son & Co. (In re McCook Metals, L.L.C.)*, No. 05 C 2990, 2007 WL 4287507,
at *5 (N.D. Ill. Dec. 4, 2007), and is the proper subject of an expert affidavit
submitted on summary judgment, *see Eerie World Entm't, L.L.C. v. Bergrin*, No. 02
Civ. 6513 SAAS, 2004 WL 2712197, at *3 (S.D.N.Y. Nov. 23, 2004); *Barber v.
Production Credit Servs. (In re KZK Livestock, Inc.)*, 290 B.R. 622, 627 (Bankr. C.D.
Ill. 2002). Since the banks have not controverted the Trust's statement that CLC
was insolvent, the statement is deemed admitted. *See* L.R. 7056-1(C).

they gave up their stock. If CLC's insolvency meant the stock had no value, it was the Trust's obligation to adduce evidence showing as much. No evidence has been offered.

The banks do not all stand on the same footing, however, with respect to the remaining elements of the section 550(b)(1) defense: good faith and lack of knowledge that the transfers were voidable. Although these are discrete statutory requirements, they both appear to hinge on knowledge – what the transferee knew about the transfer. In *Bonded*, the court observed that a transferee "may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." *Bonded*, 838 F.2d at 897-98. A transferee may have knowledge of voidability even without a "complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable." *Id.* at 898. On the other hand, a transferee has no duty to investigate when "nothing known so far" points to voidability. *Id.* "A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own." *Id.* The question here, then, is whether the banks had "inquiry notice" that the funds they received from WK originated with CLC. *Joy Recovery*, 286 B.R. at 81.

No evidence in the record supports the inference that Howard and HSB knew the funds came from CLC. Howard and HSB submit an affidavit attesting to their lack of knowledge. (P. 7056-1 Resp. ¶ 41). In response, the Trust relies on the cashier's check HSB received for its CLC shares. But the check was drawn on WK's

account at Hinsdale Bank & Trust, not on a CLC account. The check indicated as much on its face. And although the check listed "CLC Stock Purchase" as the remitter rather than Peter Hueser (D. 7056-2 Resp. ¶ 39, 41), the remitter obviously was not a "stock purchase." The entry suggests that someone at the bank simply used the remitter line as a subject or memo line by mistake. Nothing about the check would have led Howard or HSB to believe that CLC might have been the source of the funds, warranting further investigation. *Cf. Joy Recovery*, 286 B.R. at 81 (drawing the opposite conclusion where the transferee knew that the bank on which the check was drawn was the debtor's bank).

The same cannot be said for Lincoln and LSB. Lincoln and LSB have also submitted an affidavit asserting their lack of knowledge that the funds came from CLC. (P. 7056-1 Resp. ¶ 41). Payment for their stock also came from Hinsdale Bank & Trust, this time in the form of a wire transfer to Lincoln with WK as the originator and Hueser as the beneficiary. (*Id.* at ¶ 36; D. 7056-2 Resp. ¶ 34). In response, however, the Trust points to internal records of Lincoln stating that the transfer was received "[f]rom Commercial Loan Corporation." (D. 7056-2 Resp. ¶ 36). And when Lincoln transferred the funds to LSB's account at Lincoln, the ticket noted the deposit as "Wire Transfer From Commercial Loan Corporation." (*Id.* at ¶ 37). The notations in the internal records of Lincoln and LSB stating that the funds came from CLC – notations for which Lincoln and LSB offer no explanation, innocent or otherwise – are enough to raise triable issues of fact about whether these banks had knowledge of the voidability of the transfers and acted in good

faith.

Because the undisputed facts establish a section 550(b)(1) defense to the subsequent transferee liability of Howard and HSB but not of Lincoln and LSB, summary judgment will be granted to Howard and HSB on Counts VII, VIII, and IX but denied to Lincoln and LSB on Counts XIII, XIV, and XV.

### 3. Stock Dividend

Summary judgment will also be granted to Howard and HSB on Count IV, the claim concerning the February 2002 dividend, because the Trust has not made out a prima facie case that CLC paid HSB the dividend with fraudulent intent.

Count IV is a claim under section 5(a)(1) of the Illinois Uniform Fraudulent Transfer Act (the "IUFTA"), 740 ILCS 160/5(a)(1) (2002). Section 5(a)(1) deems fraudulent a transfer to a creditor made "with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* To succeed in proving that a transfer was fraud in fact or actual fraud (as opposed to fraud in law or constructive fraud under section 5(a)(2), *see Scholes v. Lehmann*, 56 F.3d 750, 756-57 (7th Cir. 1995)), a plaintiff must demonstrate that the transferor made the transfer with a specific intent to defraud creditors. *Wachovia Securities, LLC v. Neuhauser*, 528 F. Supp. 2d 834, 858 (N.D. Ill. 2007); *Grochocinski v. Schlossberg (In re Eckert)*, 388 B.R. 813, 839 (Bankr. N.D. Ill. 2008).

Because direct evidence of fraudulent intent is rarely available, intent can be inferred from the circumstantial presence of certain factors, or "badges of fraud."

The IUFTA lists eleven such badges. *See* 740 ILCS 160/5(b); *Eckert*, 388 B.R. at

840. In sufficient number, these badges of fraud may raise an inference of actual

fraud. *Eckert*, 388 B.R. at 840; *Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill.

App. 3d 241, 251, 662 N.E.2d 595, 602 (1st Dist. 1996). Because the statutory

badges of fraud are simply considerations, however, and not an exhaustive list, no

set number or combination automatically demonstrates fraudulent intent. *See*

*Brandon v. Anesthesia & Pain Mgt. Assocs., Ltd.*, 419 F.3d 594, 600 (7th Cir. 2005)

(decrying the badges' "mesmerizing force" and noting they "are not additive");

*Lindholm v. Holtz*, 221 Ill. App. 3d 330, 334, 581 N.E.2d 860, 863 (2nd Dist. 1991)

(holding that "proof of some, or even all," of the badges may not show intent).

To stave off summary judgment, the Trust must make a prima facie case of

fraudulent intent. *See Celotex*, 477 U.S. at 322. Of the eleven statutory "badges of

fraud," the Trust identifies three it contends were present in connection with the

2002 dividend payment to Howard and HSB: (1) the payment was to an insider,

740 ILCS 160(5)(b)(1) (2002); (2) the value of the consideration CLC received was

not reasonably equivalent to the value of the dividend, 740 ILCS 160(5)(b)(8) (2002);

and (3) CLC was insolvent when the dividend was paid, 740 ILCS 160(5)(b)(9)

(2002). The Trust contends fraud can be inferred from these three badges.

But in fact only two of the badges are present. First, no reasonably

equivalent value was given for the dividend. There is no "reasonably equivalent

value" when the consideration for a transfer is either inadequate or nonexistent.

-24-

*Leibowitz v. Parkway Bank & Trust Co. (In re Image Worldwide, Ltd.)*, 139 F.3d 574, 577 (7th Cir. 1998). The dividend here was a unilateral transfer of $30,748, and no evidence has been offered that anything was given in return. *See Fisher v. Hamilton (In re Teknek, LLC)*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (holding that dividend paid to LLC members was not a transfer for reasonably equivalent value). Second, it is undisputed that CLC was insolvent on February 12, 2002, when the dividend was paid. (D. 7056-2 Resp. ¶ 48). The Trust has therefore established no reasonably equivalent value and insolvency.

No evidence, however, shows the dividend was paid to an insider. The Trust identifies no evidence but simply asserts that it was. (*See* Tr. Mem. at 21). The IUFTA defines an "insider" of a corporate debtor as, among other things, a director, an officer, or a person in control of the corporation. *See* 740 ILCS 160/2(g)(2) (2002). The record here establishes that Howard was an original CLC shareholder, and that each of the original shareholders was effectively a CLC director. (P. 7056-2 Resp. ¶ 13). Howard was therefore an "insider" of CLC. But Howard did not receive the dividend. Howard transferred its CLC stock to HSB, a Howard subsidiary, in August 2000 (*id.* at ¶ 15), and the February 2002 dividend was paid to HSB (*id.* at ¶ 25). The Trust supplies no reason to believe that HSB was a director of CLC, much less that HSB had the ability to control CLC.[12]

---

[12]    As far as the sparse record shows, HSB was a separate legal entity from Howard. If HSB was not a separate legal entity from Howard – if HSB was in some way identical to, or the alter ego of, Howard, and therefore as much CLC's insider as Howard itself – it was up to the Trust both to adduce evidence raising

With evidence sufficient to establish only two badges of fraud – lack of reasonably equivalent value and insolvency -- the Trust has raised no inference of fraudulent intent. Indeed, these two badges of fraud standing alone are arguably never enough to establish *actual* fraud because lack of reasonably equivalent value and insolvency are the elements of *constructive* fraud. *See* 740 ILCS 160/5(a)(2), 6(a) (2006); *Eckert*, 388 B.R. at 839. If the elements of constructive fraud were enough to demonstrate actual fraud, the constructive fraud provisions of the IUFTA would be superfluous. Statutes should not be construed to render portions of them superfluous. *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).

Because the record does not establish a prima facie case of actual fraud, summary judgment will be granted to Howard and HSB on Count IV.[13]

## IV. Conclusion

In sum, the motion *in limine* directed at the Fogel affidavit is construed as a motion to strike the affidavit and is granted. The motion *in limine* directed at the O'Malley affidavit is construed as a motion to strike the affidavit and is denied. The banks' motion for partial summary judgment is granted in part and denied in part. The motion is granted on Counts IV, VII, VIII, and IX and is denied on

---

that inference and to argue the point. The Trust has done neither.

[13]   It is worth noting that Count V of the Trust's amended complaint alleges a constructive fraud claim under section 5(a)(2) of the IUFTA in connection with the same February 2002 dividend payment. Howard and HSB have wisely not sought summary judgment on that count.

Counts XIII, XIV, and XV.[14] Separate orders will be entered in accordance with this opinion.

Dated: November 19, 2008

A. Benjamin Goldgar
United States Bankruptcy Judge

_____

[14]     This ruling and the Trust's earlier voluntary dismissal of certain counts leave for trial the following:  Counts V and VI against Howard and HSB and Counts XIII, XIV, and XV against Lincoln and LSB.