UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COMMERCIAL LOAN CORPORATION, | ) | No.  04 B 18946 |
| | ) | |
| Debtor. | ) | |
| ——————————————— | ) | |
| | ) | |
| CLC CREDITORS' GRANTOR TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05 A 2538 |
| | ) | |
| HOWARD SAVINGS BANK; LINCOLN | ) | |
| STATE BANK; HSB DEVELOPMENT | ) | |
| CORPORATION; HOWARD | ) | |
| LIQUIDATION CORPORATION; and | ) | |
| LSB FINANCIAL SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | Judge Goldgar |

## MEMORANDUM OPINION

This adversary proceeding is before the court for ruling after trial on Counts

XIII, XIV, and XV of the amended complaint of plaintiff CLC Creditors' Grantor

Trust (the "Trust") against defendants Lincoln State Bank ("Lincoln") and LSB

Financial Services, Inc. ("LSB").[1/] The three counts are fraudulent transfer claims

_____

[1/]      These are the last three counts of what was originally a fifteen-count
complaint. On September 10, 2007, Counts I-III and X-XII were voluntarily
dismissed. (Dkt. No. 74). On November 19, 2008, summary judgment was granted
to defendants Howard Savings Bank, Howard Liquidation Corporation, and HSB
Development Corporation on Counts IV and VII-IX. (Dkt. No. 136). On August 24,
2009, Counts V and VI became moot when defendants Howard and HSB were
dismissed as parties pursuant to settlement. (Dkt. No. 154). The August 24 order
was later amended to dismiss Howard Liquidation as a defendant. (Dkt. No. 184).

under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160 (2002)

("IUFTA"), one for actual fraud under section 5(a)(1) (Count XIII), and two for

constructive fraud under sections 5(a)(2) and 6(a) (Counts XIV and XV). All three

claims arise out a sale of stock in the debtor, Commercial Loan Corporation ("CLC"),

from LSB to CLC's president, Peter M. Hueser ("Hueser"), for $225,000. Hueser

fraudulently used $225,000 of CLC's own money to buy the stock, transferring the

money to Lincoln where it was deposited into an account of LSB. In its complaint,

the Trust seeks to recover the transferred funds from Lincoln and LSB, Lincoln's

subsidiary. For the reasons that follow, judgment will be entered in favor of Lincoln

and LSB on all counts.

## 1. Jurisdiction

The court has subject matter jurisdiction over this case pursuant to 28 U.S.C.

§ 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core

proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (H).

## 2. Facts

The evidence at trial showed the following.[2]

### a. Lincoln and CLC

Lincoln is a savings bank founded in 1999 in rural Rochelle, Illinois. (Tr. 2:3-

4). LSB is a wholly-owned subsidiary of Lincoln. (Stip. ¶ 9). Richard Ohlinger

---

[2]      The trial transcript is in three volumes and is cited as "Tr.
[vol.]:[page]." The Trust's exhibits are cited as "P. Ex. [number]." The parties'
Stipulation of Facts is cited as "Stip. [paragraph number]."

("Ohlinger") is president of both Lincoln and LSB and has held those positions since Lincoln's founding. (*Id.* ¶ 7; Tr. 2:3).

CLC was incorporated in 1999 and began operating in March 2000. (P. Ex. 6 at 3). Hueser ("Hueser") was CLC's president. (Tr. 2:7). CLC's principal business was to originate and service commercial loans secured by real and personal property. (Stip. ¶ 12). Although CLC directly funded some of the loans it made, the vast majority of the loans were funded through the sale of participation interests to various banks. (*Id.* ¶ 13).

Because Lincoln was too new and too small to have a commercial loan portfolio of its own, the bank invested in CLC to gain access to commercial borrowers. (Tr. 2:4). Lincoln acquired $125,000 in CLC stock and was one of CLC's original shareholders, along with three other small banks and Hueser himself. (*Id.* 2:4, 51; Stip. ¶ 16).

Between 2000 and CLC's eventual demise in 2004, Lincoln purchased approximately two million dollars in loan participations. (*Id.* 2:4-5). Lincoln was purchasing several participation interests each month and as a result was receiving regular monthly payments from CLC as servicer of the loans. (*Id.* 2:92). Most of these payments were made via wire transfer, and Lincoln frequently received wire transfers from CLC. (*Id.* 2:100).

In August 2000, for reasons that have not been explained but are not

material, Lincoln transferred its CLC stock to LSB. (Stip. ¶ 22).[3]

### b. The Stock Transaction

In the fall of 2001, Hueser began carrying out a scheme to buy up the CLC

stock of the other shareholders. He had CLC establish on its books an $850,000

unsecured line of credit to MFC, LLC ("MFC"). (Stip. ¶ 55). MFC, however, did not

exist; Hueser simply invented the company. (*Id.*; Tr. 1:27, 32, 65).[4] Over roughly

the next year and a half, Hueser had MFC draw on the line of credit, and he

personally used funds that CLC advanced to MFC to buy the CLC stock. (Stip. ¶

63; Tr. 1:27-39; *see* P. Ex. 7, Doc. entitled "MFC Summary Screen"). By March

2003, Hueser was the sole owner of CLC. (Stip. ¶ 26).

LSB was the first to sell its stock. Lincoln's board approved a sale and

authorized Ohlinger to negotiate the transaction. (Tr. 2:8-9, 59-60). LSB was

---

[3]     At trial, Ohlinger contradicted this stipulated fact, insisting that LSB
rather than Lincoln was an original CLC shareholder. (Tr. 2:51-54). Ohlinger's
testimony also contradicted the parties' pretrial Stipulation of Facts in several other
respects. In cases of contradiction, the stipulation governs. *Cleveland Hair Clinic,
Inc. v. Puig*, 200 F.3d 1063, 1068 (7th Cir. 2000) ("Voluntary stipulations bind the
parties."); *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1173 (7th Cir. 1998); *see
Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (noting in dictum
that a stipulation is a judicial admission, binding on the parties, and may not be
contradicted at trial).

[4]     CLC maintained a loan file for MFC, but the file was skimpy, with few
of the documents customarily found in loan files. (Tr. 1:89-90). The file contained
only standard forms: a loan agreement, a promissory note, a company resolution,
an agreement to provide insurance, and a security agreement (strangely, since the
line of credit was unsecured). (*See* P. Ex. 7, documents entitled "MFC Promissory
Note"). Each of these documents, moreover, bore the forged signature of a
professional actor from the television show *Buffy the Vampire Slayer* (Tr. 1:91) –
suggesting that if nothing else Hueser had a sense of humor.

represented in the transaction by attorney James Kemp ("Kemp"), and all of

Lincoln's dealings with Hueser were conducted through Kemp. (*Id.* 2:10, 39).[5] On

November 29, 2001, LSB and Hueser entered into a three-page agreement under

which LSB would sell its stock in CLC to Hueser for $225,000. (Stip. ¶ 54; Tr. 2:60;

*see* P. Ex. 2). The agreement called for a closing of the sale at Kemp's office on

December 31, 2002 (a date the parties probably intended to be 2001). (P. Ex. 2, ¶

6). At the closing, LSB was to deliver its stock to Hueser, and Hueser was to deliver

"in good funds the Purchase Price." (*Id.* ¶¶ 7-8). Ohlinger never had any

discussions with Kemp or Hueser about the source of Hueser's funds to buy the

stock and so never inquired what the source might be. (Tr. 2:11).

Despite the December 31 closing date and location, Hueser began taking

steps to pay the purchase price on December 27. That day, he caused CLC to

advance $225,000 to MFC on its line of credit. (Stip. ¶¶ 56, 59; *see* P. Ex. 6 at 6; P.

Ex. 7, Doc. entitled "MFC Summary Screen"). The funds came from CLC's account

at Oak Brook Bank (Tr. 1:33), but they were not sent to MFC itself since there was

no such company (Stip. ¶ 56). Instead, the funds were wire transferred to Hinsdale

Bank & Trust ("Hinsdale Bank") where they were deposited into the account of WK

---

[5]        Kemp was CLC's corporate secretary and registered agent. (Stip. ¶¶
35, 39). Kemp had also represented each of the shareholder banks (although the
record does not disclose in which matters he represented them or when) (*id.* ¶¶ 41-
43), and he had represented Hueser in matters unrelated to CLC (*id.* ¶ 37). There
is no evidence that Kemp represented both Hueser and LSB in connection with the
stock sale.

Financial, Inc. ("WK"). (*Id.* ¶¶ 56, 63; Tr. 1:33).[6]

WK was a corporation formed in the late 1990s to fund a bank acquisition that ultimately failed. (Stip. ¶¶ 45, 61-62). After the acquisition's failure, the investments of WK's shareholders were returned to them (*id.* ¶ 62), leaving only $694.45 in the account at Hinsdale Bank as of December 28, 2001 (P. Ex. 7, Doc. HBT 00073; Tr. 1:39). Hueser was one of the shareholders in WK, though not the only one. (*Id.* ¶ 62). According to the Trust's expert, Patrick J. O'Malley ("O'Malley"), WK was "controlled by" Hueser. (P. Ex. 6 at 3, 6-7). O'Malley did not explain the basis for this conclusion in his testimony, and no basis for it appears in his report. (*See* P. Ex. 6).

O'Malley determined that WK was a "conduit" for the money deposited into the Hinsdale Bank account. (*Id.* at 3). By "conduit," O'Malley said, he meant "a pass-through entity that was used to transfer money from point A to point B." (Tr. 1:26-27). As part of his work, O'Malley also examined Hinsdale Bank's records concerning WK's account. O'Malley testified that there were no instructions in the bank's records – from Hueser or from anyone else – requiring WK to do anything with the $225,000 CLC deposited into WK's account on December 27. (Tr. 1:64-65). No evidence was offered of any sort of restriction on WK's use of the money.

The next day, December 28, Hueser had WK instruct Hinsdale Bank to wire

---

[6]    The testimony at trial was that Hinsdale Bank received the deposit on December 28, not December 27 (*see* Tr. 1:33, 36-38), and the bank's records also show December 28 as the deposit date (*see* P. Ex. 7, Doc. No. HBT 00073; Tr. 1:37). But the parties' stipulated to December 27, and again the stipulation governs. *River*, 160 F.3d at 1173. The precise date is not material in any event.

transfer the $225,000 from WK's account at the bank to Lincoln. (Stip. ¶ 57; see P.

Ex. 7, Doc. Nos. HBT 00070-72). WK's written instruction to Hinsdale Bank was to

wire the money to Lincoln, "Attn: Richard Ohlinger," with the credit to "P.

Hueser/CLC stock purchase." (P. Ex. 7, Doc. No. HBT 00072). The bank's

"Outgoing Wire Transfer" form likewise indicated the transfer was for the credit of

"P. Hueser," and the phrase "Attn: Richard Ohlinge[r] (CLC Stock Purchase)"

appeared on the form next to "Account Number." (Id., Doc No. HBT 00071).

Nothing in Hinsdale Bank's records relating to WK's account or the wire transfer

suggested that the $225,000 in fact came from CLC.

The same day, Lincoln received the wire transfer from Hinsdale Bank. (Stip.

¶ 57). WK was listed on the confirmation as the originator, and Hueser was listed

as the beneficiary. (Id. ¶ 58). Nothing in the confirmation indicated that the wired

funds originated from CLC. (Id.). Lincoln was alerted to the wire transfer when

Megan Challand ("Challand"), a Lincoln accounting clerk, received a call from the

Federal Reserve Bank. (Tr. 2:98-99).[7] According to Challand, it was standard

procedure for personnel at the Federal Reserve Bank, in notifying Lincoln of a wire

transfer, to identify the sender. (Id. 2:99). Asked whether she recalled whom the

_____

[7]      The call was apparently necessary because there was no electronic
connection between the Federal Reserve Bank and Lincoln's service bureau, the
outside company that processed Lincoln's customer accounts. (Tr. 2:71, 77). See 1
Donald L. Baker & Roland E. Brandel The Law of Electronic Fund Transfer Systems
¶ 11.02[3] at 11-9 (2009 rev.) (noting that in 1990 the Federal Reserve Board
adopted a requirement that Reserve banks "notify by telephone all depository
institutions that do not have access to Fedwire (off-line banks) of the Reserve bank's
receipt of third-party funds transfers sent to the off-line banks").

Federal Reserve Bank identified in this instance, Challand replied: "I believe that they said it was from Peter Hueser. . . . And I'm pretty sure Commercial Loan Corp." (*Id.* 2:99-100). Challand added that she knew who Hueser was because of the volume of business Lincoln did with CLC, and she associated Hueser with CLC. (*Id.* 2:100).

Challand was responsible for booking the transaction in Lincoln's electronic journal for December 28. (*Id.* 2:21, 41, 63-64, 67-68, 102). The journal had a column entitled "Description" that left a small amount of room for Challand to create a brief memorandum entry sufficient to identify each transaction. (*Id.* 2:22-23, 69-70, 103-05). On line 34 of the journal, Challand manually entered the $225,000 wire transfer and for the description wrote: "Wire Transfer from Commercial Loan Corporation." (*Id.* 2:108; *see* P. Ex. 3, line 34).

How she came to give the wire transfer this description is not entirely clear. Challand testified that because there was no loan number associated with the transfer, she asked Lincoln's chief financial officer, Wayne Koch (Koch"), how to book it. (Tr. 2:59, 100-01). Challand did not say what Koch told her – she was never asked – and testified that in putting the description on line 34 she "just assumed that it was a Commercial Loan Corp. wire for a loan just because of the name Peter Hueser." (*Id.* 2:104).[8] Koch could not recall a conversation with Challand (though he agreed one must have taken place under the circumstances),

---

[8]      For other wire transfers from CLC on December 28, however, Challand entered the more perfunctory description: "CLC Wire." (*See* P. Ex. 3, lines 15-16). Challand was unable to explain the difference in the descriptions. (Tr. 2:110).

and he could not explain the description on the ledger. (*Id.* 2:67, 83-85).

On receipt of the wire transfer from Hinsdale Bank, Lincoln immediately transferred the funds to LSB's money market account at Lincoln. (Stip. ¶ 58; Tr. 2:78-80, 102; *see* P. Exs. 3, 4). Challand booked this transaction, as well, on Koch's instructions. (Tr. 2:109). The entry appears on line 35 of Lincoln's journal, and Challand again gave "Wire Transfer from Commercial Loan Corporation" as the description. (*See* P. Ex. 3, line 35). Asked specifically whether Koch had directed her to describe the transfer as one from CLC, Challand could not recall whether he had done so or whether "it was just me assuming the Peter Hueser name connection." (Tr. 2:109-10). Lincoln's record of LSB's account shows the $225,000 deposit with the same description – "Wire Transfer from Commercial Loan Corporation" (P. Ex. 4) – but that description on the account record was not inserted manually. It appeared there automatically because of the journal entry. (Tr. 2:86).

Ohlinger and Koch both said that the descriptions of the transaction in Lincoln's records as "Wire Transfer from Commercial Loan Corporation" were wrong. (*Id.* 2:22, 48-50, 89). The descriptions, they testified, should have read "Sale of Commercial Loan Corp. stock" (*id.* 2:22) or "Proceeds from Sale of Commercial Loan Corporation stock" (*id.* 2:89).

At trial, Ohlinger conceded the source of the funds and the route they took to LSB (*id.* 2:50-51), but he denied knowing at the time of the transfer that the $225,000 consisted of CLC's funds (*id.* 2:20, 30, 32, 57). He also denied knowing anything about WK or MFC. (*Id.* 2:30). Koch, too, denied knowing that CLC was

the source of the funds, testifying that he was not involved in the stock sale and had

assumed Hueser was the source of the funds because Hueser was buying the stock.

(*Id.* 2:60, 74, 90-91). Koch also denied knowing about MFC. (*Id.* at 2:74).

### c. The Demise of CLC

Each bank that was an original shareholder of CLC also had a director on

CLC's board. (Stip. ¶ 17). Ohlinger was the CLC director representing Lincoln, and

he attended all CLC board meetings. (Tr. 2:5-6). As CLC president, Hueser

reported to the board at each meeting, and his report included a discussion of CLC's

finances. (*Id.* 2:7). Hueser never said anything at the board meetings to lead

Ohlinger to believe CLC was having financial difficulties. (*Id.*). Not all of the

directors were satisfied with Hueser. There were "screaming matches" at board

meetings about CLC's failure to report to the participant banks, about CLC's

charges for servicing the loans, and about Hueser's compensation. (Stip. ¶ 33; *see

also* P. Ex. 5 at 4, ¶ 13).[9]

CLC's financial statements gave no cause for concern. The audited financial

statement for the year ending December 31, 2000, after CLC's first ten months of

operation, showed the corporation was solvent. (*See* P. Ex. 7, Doc. entitled

"Financial Statements"). CLC produced no financial statement for 2001 until 2003,

but the  audited financial statements for the years ending December 31, 2001, and

---

[9]    At trial, Ohlinger denied there were "shouting matches" or even
"anger" and said board meetings were "fairly cordial." (Tr. 2:8). Again, the parties'
stipulation governs over Ohlinger's conflicting testimony. *River*, 160 F.3d at 1173.

December 31, 2002, likewise showed CLC to be solvent. (*See id.*). In fact, CLC was

insolvent on December 31, 2001, and December 31, 2002 (P. Ex. 6 at 9-12), and the

audit reports that CLC's auditors, Ostrow Reizin, furnished were, in O'Malley's

words, "deeply flawed" (Tr. 1:49).[10] It turned out that CLC staff had been feeding

the auditors false information. (*Id.* 1:50).

No evidence showed that Ohlinger or any other CLC board member knew, or

had reason to know, that the financial statements painted a false picture of CLC's

condition. No evidence showed dissatisfaction – "screaming matches" – on the part

of the board members concerning Hueser's reporting of CLC's financial condition.

More than once, in fact, CLC declared dividends on apparent "profits," even doing so

in 2002. (*Id.* 2:35). The dividends were declared at the direction of CLC's board.

(*Id.*).

Ohlinger remained a member of the CLC board despite LSB's sale of its CLC

stock to Hueser at the end of 2001 because Lincoln still had several large loans CLC

had originated and Lincoln felt it was in its best interest to keep track both of the

loans and of CLC. (*Id.* 2:27). Lincoln continued to do business with CLC even after

the stock sale, purchasing participation interests in CLC loans. (*Id.* 2:28). Ohlinger

did not resign from the board until 2003. (*Id.*).

Large-scale financial wrongdoing at CLC eventually came to light in early

_____

[10]    According to O'Malley, the flaws took many different forms, including
listing a fictitious borrower, listing fictitious advances against loans, and failing to
recognize losses when appropriate. (Tr. 1:74). In general, he said, "they would all
be lumped in the category of overstating asset value and overstating profitab[ility]
of the entity." (*Id.*).

2004. The FDIC and OTS convened a meeting at which regulators told the many bankers and lawyers in attendance (one of whom was Ohlinger) that CLC was "a disaster," that "millions and millions of dollars" had been misappropriated. (*Id.* 2:19-20).[11/] CLC filed bankruptcy in May 2004. (Stip. ¶ 10). Hueser was indicted, pled guilty to federal criminal charges arising out of the CLC fraud, and was sentenced to eight years imprisonment. (P. Ex. 6 at 4; *see also United States v. Hueser*, No. 06 CR 470 (N.D. Ill. Nov. 1, 2006)). He was also ordered to pay $18.4 million in restitution to the participant banks. (*Id.*).

Ohlinger said he first learned of financial problems at CLC during the meeting with the FDIC and OTS. (Tr. 2:19). Even after the meeting, he was unaware for as long as another six months that the $225,000 Hueser had used to buy LSB's stock in CLC consisted of CLC's own funds. (*Id.* 2:20). Ohlinger first learned of MFC, he said, at the creditor's meeting in the CLC bankruptcy case. (*Id.* 2:30-31). He did not see Lincoln's internal records at the time of the wire transfer (*id.* 2:31-32, 47-48), and he had occasion to review them only when discovery began in CLC's bankruptcy (*id.* 2:48, 57). As for Koch, he said he was unaware of any diversion of funds at CLC. (*Id.* 2:73). He did not hear of problems at CLC until April 2004, by which time he was no longer employed at Lincoln. (*Id.* 2:74).

---

[11/]    According to O'Malley's report, the financial wrongdoing at CLC included failing to remit loan proceeds to participant banks on a timely basis, treating non-performing loans as performing, creating a fictitious borrower, reporting fictitious draws on a line of credit, making a loan outside of CLC's own lending criteria, and selling more than 100% participation interests in loans. (P. Ex. 6 at 4).

### d.  Prior Proceedings

About two weeks after CLC filed bankruptcy, a chapter 11 trustee was appointed.  (Stip. ¶ 48).  Several of the participant banks (including Lincoln) proposed a plan (*id.* ¶ 50), and in December 2004, the court confirmed the creditors' plan, under which the Trust was created (*id.* ¶ 49; Bankr. Dkt. No. 396).

The following year, the Trust filed this adversary proceeding against Lincoln, LSB, and three other defendants.  After the close of discovery, all defendants moved for summary judgment.  For purposes of their motion, the defendants assumed the voidability of the various transfers but argued that the transfers were not recoverable under sections 550(a)(1) or (2) of the Bankruptcy Code, 11 U.S.C. §§ 550(a)(1), (2) – under section 550(a)(1) because none of the defendants was an "initial transferee," and under section 550(a)(2) because the facts established a defense under section 550(b)(1), 11 U.S.C. § 550(b)(1).

In November 2008, the court issued an opinion denying the motion of Lincoln and LSB (but granting the motion of the other two defendants).  *See CLC Creditors' Grantor Trust v. Howard Sav. Bank (In re Commercial Loan Corp.),* 396 B.R. 730 (Bankr. N.D. Ill. 2008).  The court concluded that neither Lincoln nor LSB was liable under section 550(a)(1) because neither was an "initial transferee" of the funds CLC transferred.  The funds were transferred to WK before they were transferred to Lincoln, *id.* 742-43, and the Trust failed to support its contention that WK was merely a "conduit" because there was no evidence of any restrictions on WK's "right to put the money to use for its own purposes," *id.* at 743 & n.8 (citing

*Bonded Fin. Servs. Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988)).

On the question of liability under section 550(a)(2), however, the court found the undisputed facts did not establish a section 550(b)(1) defense. *Id.* at 743-45. Lincoln and LSB received the CLC funds "for value," because section 550(b)(1) requires only "value," not some sort of equivalent value, and the CLC stock "constituted consideration sufficient to support a simple contract." *Id.* at 744. But there were factual issues about whether the funds were received "in good faith" and "without knowledge of the voidability of the transfer." 11 U.S.C. § 550(b)(1). Specifically, Lincoln and LSB offered "no explanation, innocent or otherwise," of the notations in their records suggesting that the wire transfer had come from CLC. *Commercial Loan Corp.*, 396 B.R. at 745.

The claims against Lincoln and LSB were tried in September 2009. At the close of all the evidence, Lincoln and LSB conceded the voidability of the transfer from CLC under the constructive fraud claims in Counts XIV and XV and chose to rely on their section 550(b)(1) defense. (Tr. 3:31).

### 3. Discussion

As Lincoln and LSB correctly argued, the evidence at trial established their defense to liability under section 550(b)(1). Lincoln and LSB are therefore entitled to judgment on the Trust's claims.[12]

---

[12]    Because Lincoln and LSB admitted liability on the constructive fraud claims in Counts XIV and XV and demonstrated a valid defense to all of the Trust's claims, it is unnecessary to address the actual fraud claim in Count XIII.

-14-

### a. The Section 550(b)(1) Defense

Section 544 of the Code enables a trustee to avoid certain pre-petition transfers of property that are fraudulent under federal or state law. *See* 11 U.S.C. § 544; *see also Baldi v. Lynch (In re McCook Metals, L.L.C.)*, 319 B.R. 570, 586-87 (Bankr. N.D. Ill. 2005). In this case, the Trust opted to proceed under state law, and Lincoln and LSB conceded the transfer was constructively fraudulent and therefore voidable under sections 5(a)(2) and 6(a) of the IUFTA, 740 ILCS 160/5(a)(2), 6(a) (2002). The only question is whether the Trust is entitled to recover the transfer.

Section 550 of the Code governs the liability of a transferee of an avoided transfer. Under section 550(a)(1), a fraudulent transfer can be recovered from the "initial transferee." 11 U.S.C. § 550(a)(1). Under section 550(a)(2), the transfer can also be recovered from an "immediate or mediate" transferee of the initial transferee. 11 U.S.C. § 550(a)(2). On summary judgment, the court found that WK, not Lincoln or LSB, was the "initial transferee" of CLC, *see Commercial Loan Corp.*, 396 B.R. at 742, and the evidence at trial was essentially the same as the evidence on summary judgment. The transfer is therefore potentially recoverable from Lincoln and LSB only as subsequent transferees of WK under section 550(a)(2).[13]

---

[13]    The court declines the Trust's invitation to revisit the "initial transferee" question. (*See* Tr. 3:11-14). Under *Bonded*, an initial transferee is the first entity to have "dominion over the money or other asset, the right to put the money to [its] own purposes." *Bonded*, 838 F.2d at 893. An entity is not the initial transferee if it lacks that right. *Id.* at 893-94. There was no evidence of any restriction on WK's right to use the transferred funds. O'Malley offered only the bald conclusion that WK served as a "conduit" for the transfer and admitted finding

Lincoln and LSB admit they were subsequent transferees of WK (*see* Def. Br. at 7) but assert that section 550(b)(1) bars the Trust from recovering the transfer. That section shields from liability a subsequent transferee who takes a transfer for value, in good faith, and without knowledge of its voidability. 11 U.S.C. § 550(b)(1). Because section 550(b)(1) is an affirmative defense, Lincoln and LSB had the burden of proving each element. *See Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.)*, 250 B.R. 776, 797-98 (Bankr. S.D. Fla. 2000). On summary judgment, the court found that Lincoln and LSB took the transfer for "value," *Commercial Loan Corp.*, 396 B.r. at 744, and the facts adduced at trial were unchanged from the facts on summary judgment. At trial, then, Lincoln and LSB had to demonstrate only their good faith and lack of knowledge of the transfer's voidability.[14]

---

no restriction in the account records at Hinsdale Bank on WK's ability to use the funds. (Tr. 1:64). It might also have been possible to deem Lincoln and LSB initial transferees had WK been shown merely to be Hueser's alter ego. *See Peterson v. Hofmann (In re Delta Phones, Inc.)*, Nos. 04 B 823, 05 A 1205, 2005 WL 3542667, at *7 (Bankr. N.D. Ill. Dec. 23, 2005). But no evidence was submitted in support of such a theory apart from Hueser's status as one of WK's shareholders and O'Malley's unexplained assertion that Hueser "controlled" WK.

[14]     The court also declines the Trust's invitation to revisit the "value" question. (*See* Tr. 3:22-26). Section 550(b)(1) requires "value," not "reasonably equivalent value" or "fair market value." 11 U.S.C. § 550(b)(1). Because the transaction here involved an exchange of stock for cash, there was consideration sufficient to support a simple contract. No more was required. *See McCook Metals*, 319 B.R. at 590 n.15. The Trust supplied no evidence at trial that the stock was worthless – it obviously had some worth to Hueser or he would not have gone to such trouble to acquire it – and the Trust's arguments in its trial brief for reading an equivalence standard into the term "value" are the same ones the court rejected on summary judgment. (*See* Pl. Br. at 12-13).

-16-

Although good faith and lack of knowledge are discrete statutory terms, they both appear to hinge on knowledge – what the transferee knew or should have known about the transfer. *See Stevenson v. Genna (In re Jackson)*, ___ B.R. ___, 2010 WL 1221456, at *6 (Bankr. E.D. Mich. March 26, 2010) (noting that "the two concepts overlap"). In *Bonded*, the court noted that a transferee "may lack good faith if he possessed enough knowledge of the events to induce a reasonable person to investigate." *Bonded*, 838 F.2d at 897-98. He need not have a "complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable." *Id.* at 898. "Inquiry notice" of the transfer's voidability is enough. *See Daley v. Chang (In re Joy Recovery Tech. Corp.)*, 286 B.R. 54, 81 (Bankr. N.D. Ill. 2002); *IRS v. Nordic Vill., Inc. (In re Nordic Vill., Inc.)*, 915 F.2d 1049, 1056 (6th Cir. 1990), *rev'd on other grounds sub nom. United States v. Nordic Vill., Inc.*, 503 U.S. 30 (1992). On the other hand, a transferee has no duty to investigate when "nothing known so far" points to voidability. *Bonded*, 838 F.2d at 898. A transferee who "lacks the information necessary to support an inference of knowledge need not start investigating on his own." *Id.*

The evidence showed that Lincoln and LSB lacked even inquiry notice of the transfer's voidability. Nothing in the record suggests they knew or should have known that the transferred funds originated from CLC. WK was listed in the wire transfer as the originator and Hueser as the beneficiary. The confirmation said nothing about the funds coming from CLC. Ohlinger repeatedly denied knowing that CLC was the source of the funds, adding that he did not discover where the

funds came from until six months after CLC's collapse.  He also denied knowing

about WK or MFC.  These denials were credible.  Koch likewise denied knowing

that the funds came from CLC and denied knowing about MFC (he was not asked

about WK).  Koch's denials were just as credible.  In the absence of evidence

suggesting someone at Lincoln or LSB knew enough to inquire where the funds

came from, the evidence made out the remaining elements of the section 550(b)(1)

defense.  *See Still v. American Nat'l Bank & Trust Co. (In re Jorges Carpet Mills,

Inc.)*, 50 B.R. 84, 84-85 (Bankr. E.D. Tenn. 1985).

### b.  The Records of the Wire Transfer

The Trust does not contend Lincoln and LSB actually knew the funds came

from CLC (*see* Tr. 3:50-51) but offers three reasons why Lincoln and LSB were on

inquiry notice.  First and foremost, the Trust points to the description of the

transfer in Lincoln's journal as "Wire Transfer from Commercial Loan Corporation"

and the same description in the records of LSB's money market account.  The Trust

also points to Challand's testimony that the Federal Reserve Bank said the transfer

"was from Peter Hueser" and "Commercial Loan Corp."  (*Id.* 2:99-100).

The problem with the Trust's argument about the description in the journal

is that the description appears in Lincoln's *own* records, having been entered by

Challand, a Lincoln employee.  The description was not from some outside source –

it was not a feature of the wire transfer itself – and so it could not have put Lincoln

or LSB "on notice" of anything.  *Cf. Nordic Vill.*, 915 F.2d at 1056 (cashier's check

bearing name of remitter put defendant on "inquiry notice" of voidability of

-18-

transfer); *Kendall v. Sorani (In re Richmond Produce Co.)*, 195 B.R. 455, 464

(Bankr. N.D. Cal. 1996) (same).  Thus, the description is either evidence of Lincoln

and LSB's *actual* knowledge of the origin of the funds, or it has no probative value,

and the Trust has conceded there was no actual knowledge.  As for the description

in LSB's account records, it adds nothing since it appeared there automatically as a

result of the journal entry.[15/]

That leaves Challand's statement about the telephone call from the Federal

Reserve Bank during which the transfer was identified as coming from "Peter

Hueser" and "Commercial Loan Corp."  But Challand was tentative in her

testimony, stating: "I believe that they said that it was from Peter Hueser . . . .

And I'm pretty sure Commercial Loan Corp." (Tr. 2:99-100).  More important, the

Trust would have the court infer from this testimony (1) that the Federal Reserve

Bank somehow knew the funds wired to Lincoln in fact came from a fictitious line of

credit extended on CLC's books to the equally fictitious MFC, and (2) that personnel

at the Federal Reserve Bank communicated all of this to Challand.  Nothing in the

record supports these inferences (apart, that is, from Challand's brief statement),

and they are thoroughly implausible.

The logical explanation for the journal's description of the transfer came from

Challand herself.  Lincoln was buying several loan participations each month and

_____

[15/]     As Ohlinger noted in his testimony, the description of the transaction
in the records of Lincoln and LSB as a "Wire Transfer from Commercial Loan
Corporation" was in fact wrong.  (*See* Tr. 2:22).  The wire transfer was not from CLC
at all.  It was a transfer from WK, or perhaps from Hinsdale Bank.

was receiving regular monthly payments from CLC, payments made primarily via wire transfer. (*Id.* 2:92, 100). Challand knew who Hueser was and associated him with CLC. (*Id.* 2:100). When the fateful transfer arrived from Hinsdale Bank, therefore, Challand heard the name "Peter Hueser" and "just assumed" the wire transfer was connected with a CLC loan. (*Id.* 2:104). The description in Lincoln's journal reflects that assumption. Although the journal describes differently other CLC wire transfers received the same day, the difference is too slight to place a nefarious cast on what, in the end, was merely imprecise bookkeeping.

The records of the wire transfer do not establish that Lincoln and LSB had "knowledge of the voidability of the transfer" and do not imperil their defense under section 550(b)(1).

### c. The Financial Condition of CLC

The Trust next contends that Lincoln and LSB were at least on inquiry notice because Ohlinger was a director of CLC, CLC was insolvent, and there were "screaming matches" at CLC board meetings. (Pl. Br. at 14). A transferee's knowledge that the debtor was in financial trouble is sometimes a factor in the analysis of a section 550(b)(1) defense. *See, e.g., Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d 1348, 1357 (8th Cir. 1995); *Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991); *Bonded*, 838 F.2d at 898; *Richmond*, 195 B.R. at 464.

There are two problems with the Trust's analysis in this case. One is that, as just discussed, Ohlinger neither knew nor had reason to know the transferred funds

came from CLC rather than from Hueser.  As far as Ohlinger was concerned, then, the wire transfer Lincoln received in payment for the CLC stock and the condition of CLC itself at the time were entirely separate.  Ohlinger's knowledge of CLC's financial trouble standing alone would do nothing to undermine Lincoln and LSB's defense under section 550(b)(1).

More important, the evidence at trial showed that neither Ohlinger nor any other CLC director knew or had reason to know the company was in financial trouble – not at the time of the transfer and not for quite a while thereafter. According to Ohlinger, Hueser reported regularly to the board on the financial condition of the company but never said anything at board meetings to suggest CLC had financial problems.  The company's financial statements and audit reports shed no more light on the subject because they were thoroughly inaccurate, the result of false information CLC employees had supplied to the auditors.  The directors were sufficiently misled about the actual state of affairs at the company that more than once they declared dividends on so-called "profits" although CLC was insolvent. There were "screaming matches" at CLC board meetings, as the Trust notes, but they were not about CLC's financial condition.

The financial problems at CLC before and after the wire transfer, problems of which Ohlinger did not know and could not have known, have no effect on the section 550(b)(1) defense.

### d.  The Arms-Length Nature of the Sale

Finally, the Trust maintains that the stock sale between LSB and Hueser

was not an "arms-length" transaction, given the close relationship of the parties.
The Trust raises this point in connection with its actual fraud claim under the
IUFTA (Pl. Br. at 8 n.4), but some courts consider the arms-length nature of the
transfer in addressing the "good faith" element of section 550(b)(1). *See, e.g., Gold
v. Laines (In re Laines)*, 352 B.R. 397, 406-08 (Bankr. E.D. Va. 2005); *Model
Imperial*, 250 B.R. at 798; *cf. Sherman*, 67 F.3d at 1355-56 (discussing whether a
transaction was arm's length in the context of a defense under section 548(c)).

On the whole, the evidence at trial showed the stock sale was an arms-length
transaction. Lincoln's board approved the sale and authorized Ohlinger to negotiate
the terms. LSB retained counsel for the transaction, and all negotiations with
Hueser took place through counsel. The parties eventually reached an agreement
that they memorialized in a written contract. The $225,000 purchase price called
for in the contract was in fact paid. These features all tend to establish the arms-
length nature of the transaction. *Cf. Laines*, 352 B.R. at 407-08 (finding the sale of
a house was not arms-length where the parties were "good friends of long standing"
and there was no sales contract, no evidence of negotiation over price, and no
evidence even "that any money changed hands").

It is true, as the Trust notes, that LSB was a CLC shareholder, Ohlinger was
a CLC director, and LSB's counsel, Kemp, was a CLC officer. But none of this
necessarily makes the sale less than arms-length. *See Anstine v. Carl Zeiss Meditec
AG (In re U.S. Medical, Inc.)*, 531 F.3d 1272, 1274 (10th Cir. 2008) (holding that a
transferee was not an "insider" of the debtor, although the transferee was a

-22-

shareholder and its CEO a director, where all transactions between the transferee and the debtor were arms-length). It is also true that Kemp had not only represented other CLC shareholders in the past, he had represented Hueser himself. But Kemp's representation of Hueser was limited to matters unrelated to CLC. Kemp did not represent both LSB and Hueser in the sale itself. *Cf. Prudential-Bache Sec., Inc. v. Lisle Axis Assocs.*, No. 86 C 7634, 1986 WL 12312, at *5 (N.D. Ill. Oct. 22, 1986) (finding a sale was not arms-length where both sides had the same lawyer and the contract was "skeletal").

Although the evidence of the circumstances surrounding the stock sale was not as detailed as it might have been, what evidence there was suggested the sale was an arms-length transaction.

### 4. Conclusion

Because Lincoln and LSB took the $225,000 transfer for value, in good faith, and without knowledge of its voidability, they are not liable on the Trust's fraudulent transfer claims. Defendants Lincoln State Bank and LSB Financial Services, Inc. are granted judgment in their favor and against plaintiff CLC Creditors' Grantor Trust on Counts XIII, XIV, and XV of the amended complaint. A separate judgment will be entered in accordance with this opinion.

Dated: April 29, 2010

A. Benjamin Goldgar
United States Bankruptcy Judge

-23-